2020 IL App (1st) 172017-U

No. 1-17-2017

Order filed September 30, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 13972 |
| | ) | |
| COREY LARD, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Hall concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for first degree murder is affirmed over his contention it should be reduced to second degree murder, and defendant's mittimus is corrected to reflect one sentence for first degree murder pursuant to the one-act, one-crime rule.

¶ 2    Following a bench trial, defendant Corey Lard was found guilty of 14 counts of first degree murder and 1 count of aggravated battery. The trial court sentenced him to concurrent 45-year sentences on three of the murder counts and a consecutive 6-year sentence for aggravated battery,

for a total of 51 years' imprisonment. On appeal, defendant contends his convictions for first degree murder should be reduced to second degree murder where the evidence established he acted with an actual, but unreasonable, belief in the need for self-defense. He also argues his three convictions for first degree murder should merge into one pursuant to the one-act, one crime rule because he caused one death. We affirm defendant's conviction for first degree murder, and order the clerk of the circuit court to correct the mittimus to reflect one sentence for first degree murder and one sentence for aggravated battery.[1]

¶ 3     Charged with 99 counts, defendant went to trial on 60 counts of first degree murder, 3 counts of attempt murder, 6 counts of home invasion, 4 counts of residential burglary, and 1 count of aggravated battery. Relevant here, three first degree murder counts alleged he, without lawful justification, shot and killed Henry Atkins while armed with a firearm, intentionally (count 21), knowing that such act created a strong probability of death or great bodily harm to Atkins (count 22), or during the commission of forcible felony aggravated battery with a firearm (count 24), and that during the commission of the offense he personally discharged a firearm that proximately caused Atkins's death (720 ILCS 5/9-1(a)(1)-(3) (West 2012)). The aggravated battery count alleged defendant, in committing a battery, knowingly discharged a firearm and caused injury to Luis Galvan by shooting him about the body (720 ILCS 5/12-3.05(e)(1) (West 2012)). As defendant does not contest he shot and killed Atkins, we recite only those facts relevant to the issues on appeal.

_____

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 4     Ericka Lacey testified she was engaged to Henry Atkins and living with him in an apartment building on the 1400 block of East 52nd Street in Chicago in April 2013. Atkins sometimes said hello to defendant, whom Lacey identified in court, in passing around the neighborhood, but they did not have an actual relationship. Lacey never saw the two men in any kind of fight or confrontation.

¶ 5     Shortly after midnight on April 30, 2013, Atkins left his and Lacey's apartment to go to the apartment of a friend who lived across the street, Luis Galvan. Atkins wore a black T-shirt, which was not ripped or damaged, and jeans. He did not have any guns on his person. Shortly thereafter, police informed Lacey that Atkins had been killed.

¶ 6     On cross-examination, Lacey testified Atkins was not a cocaine dealer.

¶ 7     Luis Galvan testified he and his girlfriend Catherine Figueroa lived in an apartment at 52nd and Harper Streets on April 30, 2013. Approximately three months prior, he met Atkins while walking around the neighborhood, and they became friends.

¶ 8     At approximately midnight on April 30, 2013, Galvan invited Atkins to his apartment to smoke marijuana. Galvan buzzed Atkins in, and he arrived at Galvan's apartment 25 to 30 seconds later. Atkins was directly in front of the apartment door when Galvan opened it, and Galvan did not see anyone else nearby. Galvan was wearing white basketball shorts and no shirt. He did not have a gun on his person or anything in his pockets. There were no weapons in Galvan's apartment. Atkins did not have anything in his hand and did not have a gun on his person.

¶ 9     Defendant, whom Galvan identified in court, came around the corner from the direction of the front stairway. Galvan did not know defendant and did not invite him over that night. Defendant grabbed the back collar of Atkins's shirt and tried to pull him out of the apartment doorway. Atkins

had a shocked and surprised look on his face, and grabbed the door frame to pull himself into the apartment. He did not look back to see who was pulling him.

¶ 10    Galvan grabbed Atkins under his armpits with both hands to pull him into the apartment. He saw defendant's right hand "reach over" and fire a gun one time. Defendant pointed the gun at both Galvan and Atkins when he fired; Atkins was "right in the middle" of defendant and Galvan. Prior to defendant firing the gun, Atkins did not make any movements toward defendant. Neither Galvan nor Atkins yelled at or threatened defendant. Galvan was facing Atkins, trying to pull him into the apartment, when defendant fired the gun. Galvan was shot in his left thumb. Both he and Atkins fell to the living room floor, near the couch.

¶ 11    Galvan told Figueroa to call 911; she dialed 911 on Atkins's phone and handed the phone to Galvan. An audio recording of Galvan's 911 call was admitted into evidence. On the recording, Galvan tells the call taker he does not know what happened; "the guy just came here and shot him" in the "upper body." Galvan says he does not know how "he" got into the building; "he just came up" and Galvan "thought it was somebody else" when he opened the door. He says "I don't know what they got together, I don't even know how they know each other, I just know he fucking shot him."

¶ 12    On cross-examination, Galvan denied he sold marijuana and that he was a drug dealer, and denied he had ever sold defendant marijuana. When asked whether Atkins was a cocaine dealer, Galvan testified that Atkins "told me one time he previously had a case for it." The "struggle" between Atkins and defendant lasted 30 to 40 seconds.

¶ 13    Catherine Figueroa testified she and Galvan lived in a small studio apartment on the third floor of an apartment building at East 52nd Street and South Harper Avenue in Chicago. Figueroa

had been sleeping when Galvan told her Atkins was coming over. Three minutes later, she saw Galvan and Atkins talking at the front door of the apartment. Figueroa was lying on the bed, seven or eight steps from the front door. The oven light in the kitchenette and the hallway lights were on, and Figueroa had an unobstructed view of both Atkins and Galvan. Figueroa saw Atkins standing in the doorway. Before she saw Atkins, she did not hear any voices in the exterior hallway.

¶ 14    Figueroa saw a "surprised reaction" on Atkins's face, then saw him put his hands on the door frame and move "side to side," trying to push himself into the apartment. She did not see anyone behind Atkins. When Atkins put his hands on the door frame and pushed forward, his body was pulled backward, although Figueroa did not know who or what was pulling him backward. Figueroa saw Atkins push himself forward and be pulled back three times. Figueroa did not see Atkins move toward anyone in the hallway, and did not see anything in his hands, which were on the door frame. She did not see Atkins look back when he was pulled, and did not hear Atkins or Galvan threaten or yell at anyone.

¶ 15    Galvan was wearing basketball shorts and no shirt, and did not have anything in his pockets. The pockets of his shorts were "short" and could "barely fit a cell phone." Galvan did not have a gun in his hand and was not near a gun; there was no gun in the apartment.

¶ 16    Galvan wrapped his hands around Atkins's waist and pulled him toward the apartment. Figueroa saw Galvan and Atkins stumble toward a wall behind Galvan. She also saw a hand, holding a gun, reach through the left side of the front door. Figueroa heard "a shot go off" from the front door and saw a light come out of the gun. Galvan and Atkins took a few steps and fell to the living room floor in front of the couch. Galvan got up, closed and locked the door, and called 911. Police and an ambulance arrived.

¶ 17    Figueroa identified the interior of her apartment in a series of photographs, which were entered into evidence. The front door of the apartment opens inward to a small entrance hallway with a wall in front of the door. Figueroa testified this is the wall Galvan and Atkins "held up against." The living room is to the left of the front door. Atkins is seen lying on his right side, with his back to the couch, on the living room floor, which is where he fell, according to Figueroa. There is an indentation in the living room wall, just to the left of the couch, which Figueroa stated was not present before the shooting.

¶ 18    On cross-examination, Figueroa testified neither Galvan nor Atkins were drug dealers at the time of this incident.

¶ 19    Grace Dukes testified she was a medical doctor employed at the Cook County Medical Examiner's office. The court qualified her as an expert in the field of forensic pathology.

¶ 20    Dr. Steven Cina performed Atkins's autopsy on April 30, 2013. Dukes reviewed Cina's reports and findings prior to her testimony at trial. When the Medical Examiner's office received Atkins's body, it was clothed and bloody. There were "defects" in Atkins's shirt, two gunshot wounds to his body, and "traumatic defects in both lungs and in the heart and in the chest wall." There was an entrance gunshot wound on the right side of Atkins's chest, and an exit wound on the left side of his chest. In a series of photographs, which were admitted into evidence, Dukes identified the entrance and exit wounds, as well as injuries to Atkins's heart and both lungs. These photographs show the entrance wound on the right side of Atkins's chest, directly below the armpit and approximately halfway down the bicep. The exit wound is on the left side of Atkins's chest, approximately 5 centimeters left of the left nipple.

¶ 21 The parties stipulated that evidence technician Elizabeth Dawson recovered a black T-shirt from the Medical Examiner's office. The court, which observed this T-shirt, noted it "was ripped from the back and around the neck."

¶ 22 Officer Anthony Jones testified he and his partner responded to a call of a person shot at an apartment at 52nd and Harper at approximately 12:16 a.m. They arrived fewer than five minutes after receiving the call and went into Figueroa and Galvan's apartment. Jones identified the exterior and interior of Galvan and Figueroa's apartment building in a series of photographs, which were admitted into evidence. These photographs depict a blue cap covering a shell casing just inside the living room, next to the front entrance hallway.

¶ 23 Detective Anthony Burns testified he was assigned to investigate Atkins's death. He went to Galvan and Figueroa's apartment at 52nd and Harper. No guns were recovered inside the apartment. In a series of photographs, which were admitted into evidence, Burns identified a bullet fragment on the floor behind the bed, and a wall marking from a bullet inside the apartment.

¶ 24 Burns also identified a sketch of the layout of Galvan and Figueroa's apartment, which was entered into evidence. This sketch depicts the apartment essentially in the shape of a rectangle, with its longer sides running left and right. The front door and entrance hallway are near the bottom-left corner of the apartment, with the front door on the bottom wall. To the left of the entrance hallway is the living room, which comprises approximately half the apartment. On the far left wall of the living room, near the bottom-left corner, is a bullet hole. A bullet fragment is behind the bed, which is in the upper-left corner of the living room.

¶ 25 Officer Thomas Gorman testified defendant, whom Gorman identified in court, was arrested in Chicago on June 4, 2013.

¶ 26    Defendant testified he smoked marijuana in the lobby of a building on the 1400 block of East 52nd Street on April 23, 2013. Atkins entered the lobby and said defendant "was making it hot where [Atkins] sold drugs." Atkins said defendant needed to leave the building before Atkins returned, and walked away.

¶ 27    On April 30, 2013, defendant went to Galvan's apartment and knocked on his door. Galvan was "a known drug dealer in that area," and defendant had bought marijuana from him before. Galvan answered the door, and defendant paid him $40 for a "specific amount." Galvan told defendant to wait in the hallway for a few minutes while he "put that purchase together," then went inside his apartment and closed the door.

¶ 28    Approximately five minutes later, defendant heard the buzzer for the building. Twenty to thirty seconds after that, Atkins walked up behind defendant. Defendant turned around, and Atkins grabbed defendant's jacket in the upper right shoulder area and asked why defendant was in that building. Defendant grabbed for Atkins's arm, pulled away, and told him to let go. Atkins "started throwing blows," hitting defendant in the face, and defendant tried to "block [him]self." Galvan opened the apartment door, stepped into the hallway, and asked what was going on. Atkins told Galvan to grab defendant, and Galvan "grabbed for [him] and started to pull [him] in the hall." Then both Atkins and Galvan "started pulling [defendant] in."

¶ 29    Defendant "started using the wall as leverage, trying to back pedal, grabbing for [Atkins]'s arm trying to pull away, trying to separate [him]self from the both of them." Galvan released defendant, stepped back, and raised his shirt, and defendant saw a gun. Defendant "tried to back pedal and dug down and went for the firearm" he had in his pocket. He drew his gun, and Atkins released him and tried to move out of the way. Galvan pulled Atkins in front of himself, "basically

as a shield." Defendant fired his gun toward Galvan "because [he] thought [Galvan] was going for a weapon," then turned and ran.

¶ 30    On cross-examination, defendant testified Atkins hit him three or four times before Galvan opened the apartment door. Defendant's "lip was busted" and bleeding. Galvan was wearing a white T-shirt, which he lifted up with his right hand "like he was going for a firearm" when defendant pulled back. Defendant did not recall what kind of shorts or jogging pants Galvan was wearing, except that they may have been a light gray color. Galvan's gun was on the right side of his waistband. Galvan "didn't get a chance to grab for his gun," but defendant saw Galvan's gun and thought he was going to grab it. When defendant saw Galvan's hand "by his gun," defendant drew his own gun from his left pocket. Galvan put his left arm around Atkins's neck, pulled Atkins in front of him, and used him as a shield. Defendant denied he ripped Atkins's shirt or grabbed his clothing. Defendant testified Galvan "probably ripped [Atkins's] shirt when he was grabbing him as a shield," although he did not see how Atkins's shirt was ripped.

¶ 31    Defendant fired "in the direction of" Galvan, but did not mean to hit Atkins. He "shot before [Galvan] had a chance to pull out his gun and shoot." Defendant fired his gun with his left hand; he is left-handed.

¶ 32    Defendant moved a photograph of Atkins's torso from the Medical Examiner's office into evidence.

¶ 33    The court found defendant guilty of 14 counts of first degree murder and 1 count of aggravated battery. In announcing its ruling, the court reasoned that "[t]he physical evidence does not corroborate the defendant's testimony. [Atkins's] shirt was ripped from the back and around the neck. If this was a face to face confrontation, you would expect that there might be a rip or

something *** the front of the shirt, not in the back." The court found this physical evidence corroborated Galvan's testimony that Atkins was facing him and defendant was behind Atkins. The court concluded "[i]t happened the way [Galvan] and [Figueroa] testified," and found them to be credible. The court also rejected defendant's claim that Galvan had a gun in his waistband as a "total lie" because "you could not hold a weapon in a pair of pants like that." The court concluded "the physical evidence does not corroborate the fact that this is a self-defense shootout between [Galvan] and the defendant."

¶ 34  Defendant filed a motion for new trial, which was denied. The court specifically "rejected a self-defense theory and a lesser included offense of second degree murder," explaining it did not "think this was really an unreasonable belief in self-defense."

¶ 35  The court imposed concurrent 45-year sentences on three counts of first degree murder: one sentence each for intentional murder, "strong probability" murder, and felony murder, all premised on defendant's personal discharge of a firearm that proximately caused death. (720 ILCS 5/9-1(a)(1)-(3) (West 2012)). It merged the remaining first degree murder counts. The court also sentenced defendant to 6 years' imprisonment for aggravated battery, to run consecutively to the murder sentences, for a total sentence of 51 years.

¶ 36  Defendant filed a motion to reconsider sentence, which was denied.

¶ 37  On appeal, defendant challenges his convictions for first degree murder. He argues his convictions should be reduced to second degree murder where the evidence showed he shot and killed Atkins with an unreasonable belief in the need for self-defense. Defendant also maintains his convictions for three counts of first degree murder should merge into one under the one-act, one-crime rule, because he caused one death.

¶ 38    To prove defendant guilty of first degree murder as charged, the State had to establish beyond a reasonable doubt he killed Atkins without lawful justification and either (1) intended to kill him or do great bodily harm to him, (2) knew his acts created a strong probability of death or great bodily harm to Atkins, or (3) was committing a forcible felony other than second degree murder when he killed Atkins. 720 ILCS 5/9-1(a)(1)-(3) (West 2012). Defendant does not dispute the State carried its burden with respect to first degree murder under all three theories.

¶ 39    Second degree murder is a mitigated version of first degree murder. *People v. Parker*, 223 Ill. 2d 494, 504 (2006). " '[T]he elements of first degree and second degree murder are identical, and it is the presence of statutory mitigating factors that reduces an unlawful homicide from first degree murder to second degree murder.' " *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 153 (quoting *People v. Thompson*, 354 Ill. App. 3d 579, 587 (2004)). Relevant here, section 5/9-2(a)(2) of the Criminal Code of 2012 provides a person commits second degree murder when he commits first degree murder but, at the time of the killing, had an unreasonable belief in the need for self-defense. 720 ILCS 5/9-2(a)(2) (West 2012); 720 ILCS 5/7-1(a) (West 2012) (use of deadly force only justified if a person reasonably believes it necessary to prevent imminent death or great bodily harm to himself or another).

¶ 40    When a defendant charged with first degree murder seeks to be found guilty of second degree murder instead, he must prove the existence of the statutory mitigating factor of unreasonable self-defense by a preponderance of the evidence. 720 ILCS 5/9-2(c) (West 2012). However, the State retains the burden to prove every element of first degree murder beyond a reasonable doubt and, when appropriately raised by a defendant, to disprove the mitigating factor. 720 ILCS 5/9-2(c) (West 2012). Whether a defendant's actions were committed under the

mitigating circumstance of unreasonable self-defense is a question of fact for the trier of fact to resolve. *People v. Bennett*, 2017 IL App (1st) 151619, ¶ 43. When a trial court determines a defendant failed to prove the presence of a mitigating factor by a preponderance of the evidence, the reviewing court will affirm if it determines that, " 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were not present.' " *Castellano*, 2015 IL App (1st) 133874, ¶ 144 (quoting *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996)).

¶ 41    In order to establish complete self-defense, a defendant must show: (1) force was threatened against a person; (2) the person was not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) the person actually and subjectively believed a danger existed which required the use of the force applied; and (6) his beliefs were objectively reasonable. *People v. Washington*, 2012 IL 110283, ¶ 35. However, to be found guilty of second degree murder, a defendant must only prove, by a preponderance of the evidence, that all of the first five factors were present. *Castellano*, 2015 IL App (1st) 133874, ¶ 149.

¶ 42    We find defendant did not establish he acted with an unreasonable belief in the need for self-defense when he shot and killed Atkins. There is no dispute Atkins was unarmed. Defendant did not testify he fired his gun because he felt threatened by, or the need to defend himself against, Atkins. For purposes of self-defense, a defendant's perception of the situation is measured "at the time he employed force against his aggressor." (Internal citation omitted.) *People v. Manley*, 222 Ill. App. 3d 896, 914 (1991). The evidence established Atkins was either trying to get away from defendant or being used as a "human shield" when defendant shot him. In either scenario, Atkins did not present a threat to defendant. Defendant had the burden to prove *all* of the first five factors

of self-defense (*Castellano*, 2015 IL App (1st) 133874, ¶ 149), and he failed to present any evidence that, at the time he shot Atkins, Atkins was threatening force against, or presented a danger of imminent harm to, defendant. Thus, defendant failed to establish the factors of unreasonable self defense with regard to Atkins, and the State was not required to rebut them.

¶ 43    Nevertheless, defendant argues the trial court should have found him guilty of second degree murder. The only reason defendant proffered for firing his gun was that he saw Galvan, not Atkins, reaching for a gun in his waistband. Even accepting defendant's version of events as true, he still shot an unarmed man who was being used as a "human shield" in the chest at close range.[2] Thus, even if the trial court credited defendant's account over the State's witnesses' testimony, it still could have found defendant guilty of first degree murder rather than second degree murder.

¶ 44    More importantly, we defer to the trial court's rejection of defendant's claim he saw Galvan reaching for a gun in his waistband, which the court called "a total lie," and its conclusion Galvan and Figueroa were credible. See *In re Jessica M.*, 399 Ill. App. 3d 730, 738 (2010). A trial court's decision to believe one witness's account of an attack over another "is virtually unassailable on appeal." *Id.* The trial court's credibility findings were supported by its firsthand observation of the witnesses and the physical evidence, such as Atkins's torn T-shirt. Under the facts as the trial court found them, defendant was the aggressor, and he fired a gun at two unarmed men who had not threatened him and were trying to pull away from him. Thus, the trial court's conclusion defendant

---

[2] To the extent defendant suggests he accidentally shot Atkins while aiming at Galvan, that is a question of his intent to kill, not his belief in the need for self-defense. When a defendant shoots at one person with the intent to kill, but kills an unintended victim, the doctrine of transferred intent applies. *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 60. A defendant can be convicted of murder for the death of the unintended victim. *Id.* Defendant does not challenge the evidence of intent on appeal.

did not have any belief in the need for self-defense, reasonable or unreasonable, was rational and supported by the evidence.

¶ 45    Defendant contends Atkins and Galvan being unarmed "does not alter the analysis, as it is [defendant]'s perception of danger, and not the actual peril, that is dispositive," citing *People v. Shipp*, 52 Ill. App. 3d 470 (1977). However, defendant did not claim he perceived any peril from Atkins when he shot Atkins. The facts, as found by the trial court and viewed in the light most favorable to the State, showed Atkins and Galvan were not the aggressors, but rather were attempting to escape into the apartment. Not even defendant's version of events established that Atkins was intending to and capable of inflicting serious bodily harm when defendant shot him. See *People v. Brown*, 218 Ill. App. 3d 890, 899 (1991) ("it must appear that the aggressor is capable of inflicting serious bodily harm with or without the use of a deadly weapon, and is intending to do so.").

¶ 46    Defendant also argues Dr. Dukes's testimony supported his version of events. However, the trial court has the responsibility of drawing inferences from the evidence, and we have no basis to disturb the inferences the trial court drew from Dukes's testimony. See *People v. Wright*, 2017 IL 119561, ¶ 70. Moreover, drawing inferences in the light most favorable of the State (*People v. Bush*, 214 Ill. 2d 318, 326 (2005)), Dukes's testimony supports the State's version of events. The bullet passed through Atkins's chest from his right side to his left, and struck the left wall of the apartment. From this evidence, a rational factfinder could infer Atkins was facing away from defendant when he was shot. The photographs of Atkins's autopsy show the bullet travelled in a slightly back-to-front direction as it passed through his body, further suggesting he was shot from behind. In addition, the fact that the bullet struck Atkins's right side, but Galvan's left hand,

suggests those two men were facing each other; thus, Atkins was facing away from defendant. A rational trier of fact could have found Dukes's testimony about the location of the gunshot wounds and the bullet trajectory, combined with the physical evidence, did not support defendant's claim of self-defense.

¶ 47 Defendant contends Galvan "learned that Atkins had a case for cocaine dealing in his past," which "tends to support [defendant]'s testimony about Atkins confronting him about Atkins' drug spot a week before the shooting," and "makes [defendant's] version more plausible than the State's version of a random out of the blue shooting." However, the State did not have to prove or disprove any particular theory of, or motive for, the shooting. 720 ILCS 5/9-1(a)(1)-(3) (West 2012); 720 ILCS 5/9-2(c) (West 2012). None of the factors that support a finding of unreasonable self-defense are present in this case. Accordingly, we affirm defendant's conviction for first degree murder.

¶ 48 Finally, defendant maintains, and the State agrees, his convictions for three counts of first degree murder should merge under *People v. King*, 66 Ill. 2d 551 (1977), because he caused one death. We agree.

¶ 49 In *King*, our supreme court held "a criminal defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act," also known as the one-act, one-crime rule. *People v. Coats*, 2018 IL 121926, ¶ 11 (citing *King*, 66 Ill. 2d at 566). Whether a defendant was incorrectly sentenced for multiple offenses based upon the same act is a question of law subject to *de novo* review. *People v. Cross*, 2019 IL App (1st) 162108, ¶ 147.

¶ 50 Here, all three murder convictions were premised on the singular physical act of fatally shooting Atkins. When multiple murder convictions are entered for the same act, the mittimus

should reflect only the sentence for the most serious charge. *People v. Walker*, 2011 IL App (1st) 072889-B, ¶ 39. Intentional murder under section 5/9-1(a)(1) is the most serious offense, as compared to "strong probability" and felony murder under sections 5/9-1(a)(2) and (3), respectively. See *Id.*; 720 ILCS 5/9-1(a)(1)-(3) (West 2012). Thus, only defendant's sentence for intentional murder should stand.

¶ 51    Under Illinois Supreme Court Rule 615(b)(1), a reviewing court may "reverse, affirm, or modify the judgment or order from which the appeal is taken." Ill. S. Ct. R. 615(b)(1). We have the authority to directly order the clerk of the circuit court to make the necessary corrections to defendant's sentencing order. *Walker*, 2011 IL App (1st) 072889-B, ¶ 40.

¶ 52    Defendant's mittimus should reflect a single sentence for first degree murder. See *People v. Lee*, 2012 IL App (1st) 101851, ¶ 50. Accordingly, we direct the clerk of the circuit court to correct the mittimus to reflect one 45-year sentence for first degree murder under section 5/9-1(a)(1) (intentional murder). The judgment of the trial court, including the consecutive six-year sentence for aggravated battery, is otherwise affirmed.

¶ 53    For the foregoing reasons, we affirm defendant's conviction for first degree murder. We direct the clerk of the circuit court to correct his mittimus to reflect a single 45-year sentence for first degree murder under section 5/9-1(a)(1) (count 21).

¶ 54    Affirmed as modified.