2026 IL App (1st) 242145-U

No. 1-24-2145

Order filed March 31, 2026

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 13972 |
| | ) | |
| COREY LARD, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Justices Rochford and Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's judgment, which denied defendant leave to file a successive postconviction petition, is affirmed.

¶ 2    Defendant Corey Lard was sentenced to 51 years in prison for first degree murder and aggravated battery following the shooting death of Henry Atkins and the shooting of Luis Galvan. In May 2024, defendant filed a motion for leave to file a successive petition for postconviction relief under the Post-Conviction Hearing Act (Act), 725 ILCS 5/122-1 *et seq.* (West 2024),

alleging his innocence. That petition attached affidavits from three individuals who claimed they witnessed the shooting. The trial court denied defendant leave to file his petition, and defendant now appeals.

¶ 3    For the following reasons, we affirm the judgment of the trial court.[1]

¶ 4                                    I. BACKGROUND

¶ 5                              A. Prior Trial and Appeal

¶ 6    On July 31, 2013, the State charged defendant in a 99-count indictment alleging that defendant had committed the first degree murder of Henry Atkins, attempted murder and aggravated battery of Luis Galvan, and numerous other offenses.

¶ 7    Defendant opted for a bench trial and was found guilty of first degree murder and aggravated battery. The trial court sentenced defendant to 51 years in prison. We affirmed defendant's conviction on direct appeal, although we instructed the trial court to correct defendant's mittimus. *People v. Lard*, 2020 IL App (1st) 172017-U.

¶ 8    At trial, Ericka Lacey testified that she was engaged to Atkins and lived with him in an apartment on East 52nd Street in Chicago, Illinois. Atkins sometimes said hello to defendant when they saw each other in the neighborhood, but she did not believe that Atkins and defendant had any relationship, and she never saw the two men have any form of fight or confrontation.

¶ 9    After midnight on April 30, 2013, Atkins left the apartment to go visit his friend, Galvan, who lived across the street. Shortly thereafter, police informed Lacey that Atkins had been killed.

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 10    Galvan testified that he and his girlfriend, Catherine Figueroa, lived in a studio apartment on East 52nd Street in Chicago, Illinois on April 30, 2013. He met Atkins in early 2013 while walking in the neighborhood, and the two became friends. Galvan had a prior 2011 conviction for burglary, but he denied being a drug dealer or selling drugs to defendant in the past.

¶ 11    At approximately midnight on April 30, 2013, Galvan invited Atkins to his apartment to smoke marijuana. When Atkins arrived at the door, Galvan opened the door and did not immediately see anyone else. Defendant then came around the corner from the direction of the building's front stairway and pulled on the back of Atkins's shirt collar. Atkins appeared surprised and grabbed the doorframe to pull himself inside the apartment. Galvan grabbed Atkins under his armpits to help pull him into the apartment.

¶ 12    Galvan then saw defendant's right hand "reach over," which was followed by defendant firing one gunshot. Galvan did not specifically testify to seeing defendant's gun. According to Galvan, neither he nor Atkins made any movements toward defendant or threatened him in any way. The gunshot struck Galvan in the thumb and Atkins went limp. Both he and Atkins fell onto the living room floor.

¶ 13    The audio recording of Galvan's 911 call was admitted into evidence. Galvan told the dispatcher that he did not know what happened, and that "the guy just came in here and shot him." Galvan did not know how defendant entered the building or how defendant and Atkins knew each other.

¶ 14    Figueroa testified that she and Galvan lived together on East 52nd Street in Chicago. On April 30, 2013, she was sleeping when Galvan told her that Atkins was coming over. Three minutes later, she saw Atkins and Galvan talking at the front door of the apartment. While the two were

talking, Figueroa saw a "surprised reaction" on Atkins's face and then saw him place his hands on the door frame as he tried to push himself into the apartment. She could not see anyone behind Atkins, but she saw Atkins being pulled backwards.

¶ 15    According to Figueroa, Galvan was wearing shorts with no shirt, and the pockets on his shorts were small and could barely fit a cellular phone. Galvan did not have a gun on his person and there was no gun in the apartment. She saw Galvan wrap his arms around Atkins's waist, trying to pull him into the apartment. She then saw a hand reach through the left side of the door holding a gun and heard a single gunshot. Galvan and Atkins took several steps into the apartment before they both fell onto the living room floor. Figueroa claimed that neither Galvan nor Atkins were drug dealers.

¶ 16    Dr. Grace Dukes testified at trial and reviewed Atkins's autopsy report completed by Dr. Steven Cina. Atkins had a gunshot entrance wound on the right side of his chest, and an exit wound on the left side of his chest. He also had "traumatic defects in both lungs and in the heart and in the chest wall." Dr. Dukes testified that Atkins died as a result of the gunshot wound to his chest.

¶ 17    Detective Anthony Burns testified that he was assigned to investigate Atkins's death. No guns were recovered from the apartment. Atkins's shirt was admitted into evidence and the trial court observed that it was ripped from the back and around the neck.

¶ 18    Defendant testified that a week prior to the shooting he smoked marijuana in the lobby of Atkins's building. Atkins entered the lobby and told defendant he "was making it hot where [Atkins] sold drugs." Atkins told defendant he needed to leave the building and walked away.

¶ 19    On April 30, 2013, defendant went to Galvan's apartment and purchased $40 of marijuana. Defendant claimed that Galvan was a known drug dealer in the area. Galvan told defendant to wait

in the hallway for a few minutes and closed the door. Approximately five minutes later, defendant heard the buzzer for the building, and twenty to thirty seconds later, Atkins appeared and grabbed defendant by his jacket. Atkins demanded to know why defendant was in the building. Defendant grabbed Atkins's arm and tried to pull away. In response, Atkins began hitting defendant in the face. Galvan opened the door, and Atkins told Galvan to grab defendant. The two then began pulling defendant into the apartment, and defendant used the wall as leverage to resist. Galvan stepped back and lifted his shirt, revealing a gun. Defendant further testified that Galvan then "went under his shirt for a firearm."

¶ 20    Defendant "went for the firearm that [he] had in [his] pocket," and Galvan pulled Atkins in front of him, "basically as a shield." Defendant fired at Galvan because he "thought [Galvan] was going for a weapon." After defendant fired, he ran away.

¶ 21    On cross-examination, defendant claimed Atkins struck him three or four times before Galvan opened his apartment door and that defendant's lip was bleeding. Defendant claimed that Galvan was wearing a white T-shirt which Galvan lifted up with his right hand as though he was reaching for a gun. Defendant did not recall what kind of shorts or pants Galvan was wearing, but defendant believed they may have been light gray. While defendant claimed that Galvan did not get a chance to grab his gun, defendant claimed that he saw the gun and believed Galvan was going to grab it. Defendant denied ripping Atkins's shirt and claimed that Galvan must have ripped it when Galvan tried to use Atkins as a shield. Defendant stated that he tried to fire in the direction of Galvan and did not intend to shoot Atkins.

¶ 22    The trial court found defendant guilty of 14 counts of first degree murder and one count of aggravated battery. It reasoned that the physical evidence did not support defendant's version of

events because, if defendant was telling the truth, one would expect Atkins's shirt to be ripped in the front instead of the back. The trial court found Galvan and Figueroa credible and accepted their version of events and concluded that the evidence did not support defendant's claims that he acted in self-defense.

¶ 23    The trial court sentenced defendant to three concurrent 45-year terms for first degree murder and one six-year term for aggravated battery.

¶ 24    On direct appeal, we rejected defendant's claim that he should have instead been found guilty of second degree murder. However, we agreed with defendant that his three 45-year sentences for first degree murder should have been merged because he caused one death. Accordingly, we directed the trial court to correct defendant's mittimus to reflect one 45-year sentence for first degree murder. We otherwise affirmed defendant's conviction and sentence.

¶ 25                    B. Initial Postconviction Proceedings

¶ 26    On August 20, 2021, defendant filed a postconviction petition claiming his innocence which included notarized affidavits from Devonta Carr and Orlando Lofton.

¶ 27    Carr averred that he went to Galvan's apartment on April 30, 2013, to purchase ecstasy pills from Galvan. When he arrived, he saw a man dressed in black grab defendant and say, "N*** didn't I tell you don't come over here anymore." Carr turned around and left. Upon learning that defendant had killed someone, Carr "instantly said [defendant] did it in self-defense." Defendant's cousin told Carr he should help, but Carr did not want to get involved so he never reached out to defendant. He averred he did not want to testify at defendant's trial, but he was now willing.

¶ 28    Lofton averred that he went to Galvan's apartment to buy marijuana on April 30, 2013. When he arrived, Galvan's front door was open. Galvan was on the phone kneeling next to

someone on the floor who was not moving. Galvan picked up a silver revolver and then retrieved some marijuana from underneath a futon. He asked Lofton to "get rid of it." Lofton left the building before the police arrived. A few days later, Galvan told Lofton they were trying to rob defendant, but defendant had a gun. Galvan told Lofton not to say anything or he would be charged with a "gun case."

¶ 29    The trial court summarily dismissed defendant's petition on September 17, 2021. It reasoned that the affidavits were not sufficiently conclusive to raise a colorable claim of actual innocence. We affirmed. *People v. Lard*, 2024 IL App (1st) 220089-U.

¶ 30                    C. Instant Successive Postconviction Proceedings

¶ 31    On May 30, 2024, defendant filed a motion for leave to file a successive postconviction petition and a proposed petition. In his petition, defendant alleged that he was actually innocent based on newly discovered evidence and he attached the affidavits of three potential witnesses, Mishaun Drane, Darius Hill, and Carlos Gutierrez.

¶ 32    Drane averred that he was shooting dice on the second floor of Galvan's building on April 30, 2013, when he heard yelling. Drane walked up to the third floor and saw two men, one being Galvan, pushing and pulling and violently punching defendant. He saw that Galvan grabbed for a gun in his shorts before defendant fired and ran away. After defendant fled, Drane saw Lofton approach Galvan and watched Galvan hand Lofton a gun. Drane averred that defendant never saw him and that he did not contact police because he did not want to be involved.

¶ 33    Hill averred that he saw Galvan and Atkins attacking defendant in front of Galvan's apartment. Defendant was "trying to get away from" the other two men, who were hitting defendant in the face and trying to pull him into the apartment. Hill saw "[Galvan] go for the gun

under his shirt," and "[defendant] also went for a gun." Atkins was still hitting defendant when Galvan began turning Atkins to use him to block any incoming shots. Hill averred that he never came forward because he was afraid of Galvan.

¶ 34    Finally, Gutierrez averred that he was with Galvan and Figueroa on April 30, 2013, when defendant arrived at Galvan's apartment and asked to buy marijuana. Defendant was waiting in the hallway when Gutierrez heard some commotion outside in the hallway. Galvan rushed to the door and opened it, which revealed Atkins punching defendant and "[defendant] was trying to get away" from Atkins. Gutierrez averred that Galvan "grabbed for his gun from his waist," and defendant "pulled a gun out also." Atkins tried to move out of the way, but Galvan pulled him back. Gutierrez heard a gunshot and ducked. When he looked up, defendant was gone and Galvan was on the floor with Atkins on top of him. Gutierrez left the apartment before police arrived because he was on bond and did not want to be found by police in a location with guns and drugs.

¶ 35    On October 1, 2024, the trial court denied defendant leave to file a successive petition. It first concluded that an actual innocence claim requires a petitioner to allege that they are free of all criminal liability, not just the crime of conviction. Notwithstanding that, the trial court concluded that the evidence contained in defendant's affidavits was not newly discovered and that it would not change the result on retrial.

¶ 36    Defendant filed a notice of appeal on October 17, 2024, and this appeal followed.

¶ 37                                    II. ANALYSIS

¶ 38    On appeal, defendant contends that he should be granted leave to file a successive postconviction petition and appointed counsel because he established a colorable claim of actual innocence.

¶ 39    The Act provides a three-stage process by which a criminal defendant may challenge his conviction or sentence for violations of federal or state constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). The purpose of postconviction proceedings is to allow inquiry into constitutional issues involved in the original conviction and sentence that have not been, and could not have been, adjudicated previously on appeal. *People v. Buffer*, 2019 IL 122327, ¶ 12.

¶ 40    At the first stage the trial court is required to determine whether a petition is "frivolous or patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2024); *Buffer*, 2019 IL 122327, ¶ 45. A petition is frivolous or patently without merit when it has no arguable basis in law or in fact. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition which lacks an arguable basis either in law or in fact is one which is based on an indisputably meritless legal theory or a fanciful factual allegation. *Id*. An example of an indisputably meritless legal theory is one which is completely contradicted by the record. *Id*. Fanciful factual allegations include those which are fantastic or delusional. *Id*. at 17.

¶ 41    If the trial court does not dismiss the petition as frivolous or patently without merit, the petition advances to the second stage. *People v. Edwards*, 197 Ill. 2d 239, 245 (2001). Counsel is appointed to represent the defendant, if necessary, and the State is permitted to file responsive pleadings. *Edwards*, 197 Ill. 2d at 245; 725 ILCS 5/122-4 (West 2024); 725 ILCS 5/122-5 (West 2024). At the second stage, the trial court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. *Edwards*, 197 Ill. 2d at 246. The second stage tests the legal sufficiency of the petition, and courts may not engage in fact-finding or address issues of credibility. *People v. Domagala*, 2013 IL 113688, ¶ 35.

¶ 42    At the third stage, a defendant has the burden of proving a substantial constitutional violation. *People v. Pabello*, 2019 IL App (2d) 170867, ¶ 21. The evidentiary hearing allows the parties to develop matters not contained in the trial record. *Id*.

¶ 43    One form of postconviction relief available to petitioners is that of a claim that the petitioner is actually innocent. This collateral challenge is "based on principles of fundamental fairness and borne out of our constitutional obligation to afford a person who presents new evidence that persuasively indicates that he or she is factually innocent with the additional process necessary to prevent a fundamental miscarriage of justice." *People v. Taliani*, 2021 IL 125891, ¶ 67. "Our express reason for allowing a freestanding claim of actual innocence to be cognizable under our Post-Conviction Hearing Act is our firm belief that allowing an innocent person to remain incarcerated would offend all notions of fairness and due process." *Id*. (citing *People v. Washington*, 171 Ill. 2d 475, 488-89 (1996)).

¶ 44    The Act, however, contemplates the filing of a single petition as a matter of right. *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002); 725 ILCS 5/122-1(f) (West 2024). Successive petitions are disfavored. *People v. Smith*, 2014 IL 115946, ¶ 31. A successive filing thus requires leave of court. *People v. Lusby*, 2020 IL 124046, ¶ 27; 725 ILCS 5/122-1(f) (West 2024). When a petitioner seeks to relax the bar against successive petitions on the basis of actual innocence, leave of court should be denied only where it is clear from a review of the petition and supporting documentation that the petitioner, as a matter of law, cannot set forth a colorable claim of actual innocence. *People v. Edwards*, 2012 IL 111711, ¶ 24.

¶ 45    To establish a claim of actual innocence, the supporting evidence must be: (1) newly discovered; (2) material and not cumulative; and (3) of such conclusive character that it would

probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47. Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence. *Id.* Evidence is material if it is relevant and probative of the petitioner's innocence. *Id.* Noncumulative evidence adds to the information that the fact finder heard at trial. *Id.* Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result. *Id.* The conclusive character element of new evidence is the most important element of an actual innocence claim. *Id.* At the pleading stage of postconviction proceedings, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true. *Id.* ¶ 45. In deciding the legal sufficiency of a postconviction petition, the court is precluded from making factual and credibility determinations. *Id.*

¶ 46 Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Id.* ¶ 48. The new evidence need not be entirely dispositive to be likely to alter the result on retrial. *Id.* Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence. *Id.*

¶ 47 Whether a defendant has, as a matter of law, alleged a colorable claim of actual innocence is reviewed *de novo*. *Id.* ¶ 40.

¶ 48 Here, whether the accounts of Drane, Hill, and Gutierrez constitute newly discovered evidence is dispositive, so we address it first. Taking the factual allegations in defendant's motion and petition as true, it is nevertheless defendant's burden to show that there was no lack of due

diligence. *People v. Wilson*, 2025 IL App (1st) 230027, ¶ 45. The due diligence requirement for newly discovered evidence applies to the diligence shown before trial. *People v. Ayala*, 2022 IL App (1st) 192484, ¶ 134; see also *People v. Molstad*, 101 Ill. 2d 128, 134 (1984) (new evidence "must have been discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence"). We construe as true defendant's claim that he was unaware that Drane, Hill, and Gutierrez witnessed the shooting. In some instances, being unaware of a witness's existence has been sufficient to constitute newly discovered evidence. See *e.g. People v. Ortiz*, 235 Ill. 2d 319, 334 (2009) (witness waited 10 years to admit having witnessed the murder, was standing in a place where he would not have been seen by the defendant, and made himself unavailable by moving to a neighboring state shortly after the murder). However, here the allegations in defendant's pleading are such that a mere lack of awareness of the witnesses does not persuade us that these witnesses could not be discovered through the exercise of due diligence.

¶ 49    The shooting in this case took place in the hallway of an apartment building just outside of Galvan's apartment and the door was open. One of the witnesses, Drane, claims he was in the hallway, while another, Gutierrez, was inside Galvan's studio apartment. Hill's affidavit does not specify where he was. Defendant, even after being able to identify these three individuals, has alleged nothing regarding these individuals that indicates the exercise of due diligence would not have located them. For example, we do not know whether these individuals lived in the same building as Galvan such that a routine act of canvassing the building for witnesses might have discovered them. None of them provide any details about where they lived at the time. Defendant's petition contains no allegations about the investigation trial counsel did or did not perform. We do

not have an affidavit from defendant or trial counsel stating a search for additional witnesses was unsuccessfully undertaken. Furthermore, we have no affidavit or allegations that defendant or trial counsel used the surveillance footage from Galvan's building to attempt to identify and locate any potential witnesses.

¶ 50    None of the affiants claim that they refused to speak with trial counsel or their investigators, or that they would not have cooperated with anyone at the time had someone located them. Drane only averred that he did not contact police because he did not want to be involved, and Hill averred he did not come forward because he was afraid of Galvan. Gutierrez's affidavit offers no reason why he never came forward.

¶ 51    In short, defendant has not alleged any facts that indicate he looked for additional witnesses or otherwise tried to discover any. Nor does defendant provide any allegations about how or when he became aware of any of this information or his efforts to obtain affidavits from these witnesses. See *People v. Wideman*, 2016 IL App (1st) 123092, ¶ 60. Thus, we have not been presented with sufficient facts to allow us to conclude that due diligence would not have discovered these witnesses sooner. Because defendant has not established that the evidence contained in his petition is newly discovered, we need not analyze his claim any further.

¶ 52    However, even if these witness accounts are newly discovered, they are also not sufficiently conclusive. None of the three affiants describe how the altercation began. Drane walked from the second floor to the third floor after he heard yelling and arrived with the altercation already in progress. Hill saw Galvan and Atkins hitting defendant, but his affidavit does not describe where he was that allowed him to observe the incident, and he provides no details about how the altercation started. Nor does he specifically aver that he saw defendant shoot

anyone, or that he saw or heard the gunshot. Hill's account of the incident stops after he saw Galvan and defendant reach for their guns. Gutierrez was inside Galvan's apartment and did not see how the incident began. Given that defendant testified at trial that Atkins attacked him from behind, these accounts would not aid defendant's defense that he was not the initial aggressor and would not change the result on retrial.

¶ 53    These issues are fatal to defendant's actual innocence claim, and we need not address the materiality of defendant's additional evidence nor any of the State's remaining arguments in support of affirming the judgment of the trial court.

¶ 54                                III. CONCLUSION

¶ 55    The trial court did not err in denying defendant leave to file a successive postconviction petition.

¶ 56    Affirmed.