2021 IL App (1st) 190406-U

No. 1-19-0406

March 10, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 6875 |
| | ) | |
| SPENCER JACKSON, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices Ellis and Burke concurred in the judgment.

ORDER

¶ 1    *Held*: The summary dismissal of defendant's postconviction petition is affirmed where defendant failed to state the gist of a constitutional claim of actual innocence, as the allegation that one of the victims possessed a firearm at the time of the offense, by itself, would not have probably led to a different outcome at trial by establishing that defendant acted in self-defense.

¶ 2    This appeal arises from the summary dismissal of defendant Spencer Jackson's petition for

relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)).

On appeal, defendant argues that the circuit court erred in summarily dismissing his petition, where

he set forth the gist of a constitutional claim of actual innocence predicated on self-defense. We affirm.

¶ 3    Defendant was charged by indictment with 69 counts of first degree murder (720 ILCS 5/9-1(a)(1), (2), (3) (West Supp. 2009)), 6 counts of attempt first degree murder (720 ILCS 5/8-4(a) (West 2010); 720 ILCS 5/9-1(a)(1) (West Supp. 2009)), and 4 counts of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2010)), following an incident in Chicago on January 31, 2010. The State proceeded on two counts of first degree murder, three counts of attempt first degree murder, and four counts of aggravated discharge of a firearm.

¶ 4    We set forth the evidence at trial necessary to review defendant's actual innocence claim. A comprehensive description of the trial evidence can be found in our prior disposition of defendant's direct appeal in *People v. Jackson*, 2017 IL App (1st) 142841-U, *modified on denial of reh'g.*

¶ 5    At trial, Anthony Dawson[1] testified that he was Lytony Dawson's older brother. On January 31, 2010, Anthony was dating Denise Davis, and Lytony was dating Dejuana Beuice. Anthony, Davis, Lytony, and Beuice drove Beuice's Pontiac to a club at the intersection of 83rd Street and Chappel Avenue in Chicago. At the club, they were joined by Anthony's friend James Jenkins. Anthony eventually saw defendant pull Davis's hair. Anthony asked Davis who defendant was, and Davis denied that she knew him. He then asked defendant if defendant knew Davis, but defendant "got a little attitude." Davis and Anthony left the club, and Anthony learned that defendant was Davis's ex-boyfriend.

_____

[1] Because Anthony Dawson has the same last name as the victim, Lytony Dawson, we refer to both by their first names.

¶ 6    Anthony and Davis walked to Beuice's Pontiac, which was parallel parked on a residential street beside the club. Anthony sat in the driver's seat, Davis sat in the passenger's seat, and Lytony eventually joined them in the passenger's side of the back seat. Anthony testified that Lytony was drunk, and denied that either Anthony or Lytony possessed a firearm in the Pontiac. Defendant approached Davis's window with an arm in his shirt. Anthony could not see what was in defendant's hands, but "assumed that [defendant] *** had a gun."

¶ 7    Davis lowered her window, and defendant leaned into the vehicle and spoke with Anthony. Lytony repeatedly asked defendant for a cigarette, and defendant told Lytony to "be cool." Anthony denied that Lytony tried to pull out a lighter at this time. Then, defendant drew a firearm, pointed it at Lytony, and shot Lytony in the chest twice. Jenkins drove his Ford Expedition up to the Pontiac, and Anthony drove away and heard three or four more gunshots.

¶ 8    While looking for a hospital, Anthony crashed the Pontiac into another vehicle. Jenkins drove up to the Pontiac again and helped carry Davis and Lytony into the Expedition.[2] Then, they drove to a hospital. Anthony confirmed that he had convictions for armed habitual criminal, possession of a controlled substance, delivery of a controlled substance, attempt first degree murder, and involuntary manslaughter.

¶ 9    On cross-examination, Anthony confirmed that to his knowledge, Lytony did not have any contact or "problems" with defendant prior to the shooting. Additionally, he denied that Lytony was "acting aggressive" that night, and he did not remember defendant saying, "don't reach."

_____

[2] While Anthony's testimony does not explain why Jenkins carried Davis out of the Pontiac, the testimony of Jenkins and Davis reflect that as a result of the vehicular accident, Davis's knees hit the dashboard of the Pontiac, and Jenkins carried Davis to his truck because she could not walk.

Anthony confirmed that he and Lytony were "fighting a gun case" at the time of the offense, and that Anthony was in prison at the time of trial.

¶ 10    Davis's testimony corroborated Anthony's testimony. However, Davis added that the club had security personnel at the front door who checked identifications and conducted "body search[es]." After defendant pulled Davis's hair at the club, Anthony asked defendant if he knew Davis. Davis stood behind Anthony and shook her head at defendant, and defendant denied that he knew her. Anthony shook defendant's hand and left the club with Davis.

¶ 11    After Anthony, Davis, and Lytony entered the Pontiac, defendant walked by the driver's side and asked Anthony if "everything [was] okay." Anthony responded, "[E]verything's okay." Defendant then walked to the passenger's side, and Davis saw a black firearm at the side of defendant's waist. Davis climbed down to the floor of the Pontiac. Defendant asked Davis if "everything" was "okay," and Davis stated, "[Y]es." Lytony asked defendant for a cigarette three or four times, and defendant responded, "[Y]ou can't have a cigarette. Sit back and relax." Lytony "proceeded to reach" for what Davis "assume[d]" was a lighter, and defendant grabbed Lytony by the neck with his left hand and shot Lytony with the firearm in his right hand. Anthony quickly drove away. Davis heard three or four more shots before they "pulled off," and more shots after. On the way to the hospital, Davis noticed that Lytony was no longer talking or breathing and told Anthony he was dead. When Anthony crashed the Pontiac into another vehicle, Davis's legs hit the dashboard. Davis was unable to walk, and Jenkins carried her to his truck.

¶ 12    Davis confirmed that before a grand jury, she had testified that she saw a cigarette lighter in Lytony's hand after he died. Davis denied that she saw Anthony or Lytony with a firearm or weapon that night. She also denied seeing Lytony "threaten anybody," and characterized Lytony

as "overly drunk." Davis testified that she was currently charged in a pending aggravated assault case.

¶ 13    On cross-examination, Davis stated when defendant approached the Pontiac, the windows of Davis, Anthony, and Lytony were down. When Lytony asked defendant for a cigarette, defendant told Lytony, "[D]on't move. Don't move." As defendant said this, Lytony reached into his pockets. Jenkins then drove his Expedition right behind defendant so that defendant was between the Pontiac and Expedition. When Anthony drove away and defendant continued shooting, Davis could not see where defendant was aiming because she was on the floor. Davis confirmed that she had seen Anthony with a handgun before, but had never seen Lytony with one. On redirect examination, Davis clarified that defendant was visibly holding a semi-automatic handgun before he confronted Lytony.

¶ 14    Jenkins testified that he arrived at the club that night around midnight. Jenkins saw defendant pull Davis's hair, but did not see anything else "unusual." Right before the club closed for the night, Jenkins parked his Expedition outside the front of the club and waited for a woman to meet him. He saw Anthony, Davis, and Lytony walk around the corner of the club and out of view. Then, Jenkins saw a van drive to the corner, and defendant and a woman exited the van. The woman told defendant to reenter, and defendant said, "[N]o, b***. Shut up, b***. Get back in the van, b***." The woman returned to the van.

¶ 15    Jenkins turned onto Chappel and saw defendant kneeling at the window of the Pontiac. Jenkins stopped parallel to the rear of the Pontiac. Defendant stood and looked at Jenkins, and Jenkins said, "[M]an, we ain't knowing that bulls***," which he explained meant that "we didn't come here for *** drama." Defendant turned around, pulled out a pack of cigarettes, and placed

one cigarette in his mouth. Lytony lowered his window, stuck his hand out with two fingers extended, and asked for a cigarette. Defendant told Lytony he did not need a cigarette and repeatedly told Lytony to "stop reaching." Defendant then pulled a firearm from his coat, placed it against Lytony's chest, and pulled the trigger two or three times. Anthony drove away, and Jenkins "hit the gas pedal" but his vehicle stalled for a moment. Defendant shot three or four times at the rear of the Pontiac, and then shot five or six times at the Expedition as Jenkins drove away.

¶ 16    Jenkins drove after the Pontiac and saw it crash into another vehicle. He exited the truck, heard Davis shout, "[M]y knees, my knees," and carried Davis into his truck. Jenkins and Anthony placed Lytony in the back seat of the truck, and Jenkins observed that Lytony was not moving or breathing. They drove Lytony to the hospital. Police officers recovered four bullets from Jenkins's Expedition, and Jenkins later found a bullet lodged in the ceiling. The back window and driver's side rear window were "shot out," and there were bullet holes in the rear hatch door. Jenkins denied seeing Anthony or Lytony carrying a weapon on the night of the incident. He confirmed that he had a pending case for possession of a controlled substance.

¶ 17    On cross-examination, Jenkins confirmed that when defendant leaned over the Pontiac, Jenkins drove "within a foot" of defendant and saw defendant's hands clearly. Jenkins denied that defendant was holding anything or had his hands in his pocket. Jenkins also stated that although Lytony stuck his hand out the window and asked for a cigarette, Lytony "wasn't reaching" for anything. Defendant did not "hesitate" to shoot Lytony at that point. Jenkins also clarified that the woman he met at the club remained in his Expedition until Anthony crashed the Pontiac, at which point she exited the Expedition and called someone to pick her up.

¶ 18    A Cook County medical examiner testified that he conducted an autopsy on Lytony, recovered a bullet from his heart, and concluded that his cause of death was a gunshot wound to his chest and his manner of death was homicide. The medical examiner further testified that a toxicology report showed Lytony's blood alcohol concentration was "over twice the legal limit for driving in *** Illinois."

¶ 19    A Chicago police forensic investigator testified that on January 31, 2010, at about 4:57 a.m., she and her partner arrived at the site of the shooting and inventoried 10 used cartridge cases found on the ground at the scene. The investigator also processed the Pontiac at the scene of the accident and the Expedition at the hospital. Photographs of both vehicles showed damage that was consistent with bullet damage, including "blown out" windows and recovered bullets and bullet fragments. No firearms were found at the scene of the shooting or inside the Pontiac or Expedition.

¶ 20    An Illinois state police forensic scientist testified that the cartridge cases recovered from the scene of the shooting were fired from the same firearm. The bullet recovered from Lytony's heart was "unsuitable for comparison," but a different recovered bullet and a bullet jacket were also shot from a single firearm. On cross-examination, the forensic scientist clarified that the latter two pieces of ammunition were recovered from the trunk and left rear seat of a vehicle.

¶ 21    The State entered a stipulation that if called, a Cook County Sheriff's police officer would testify that he recovered a semi-automatic pistol from a garbage can in an alley on the 1400 block of Marquette Road in Chicago on April 6, 2011. An Illinois state police firearm examiner testified that she examined the pistol, as well as recovered bullets, bullet fragments, and cartridge cases, and concluded that the pistol fired the recovered ammunition.

¶ 22    The State published a video of an interview of defendant that was conducted by a detective at a police station. This video does not appear in the record on appeal.

¶ 23    The defense called Chicago police officer Fred Hasenfein, who testified that on the night of December 22, 2007, he saw a group of individuals, including Lytony and a person holding a handgun, at the 6500 block of South Maplewood Avenue. Lytony and the person holding the handgun separated from the group, and Hasenfein approached the two. Lytony removed a handgun from his coat, gave it to the other person holding a handgun, and that person put the two handguns inside a mail slot. Hasenfein arrested Lytony and recovered the two handguns.

¶ 24    Defendant testified that on January 31, 2010, at 1 or 1:15 a.m., he arrived at the club. Davis, whom he had dated "a few years prior," walked by him and he "made [a] gesture at her hair, like hey." Anthony asked defendant if defendant knew Davis, and Davis stood next to Anthony "making gestures like no." Defendant stated he did not know Davis, apologized, and shook Anthony's hand. Defendant thought the confrontation was "over." When the club closed at 2:30 or 2:45 a.m., defendant left and saw Davis inside a Pontiac at the side of the club. Davis stuck her head out of the window, called defendant's name, and asked him to tell Anthony they had "nothing going on."

¶ 25    Defendant approached the vehicle. He testified that he had a firearm in his pocket "to protect [him]self" because "[i]t gets kind of rough over there." Defendant denied that he intended to use the firearm or that he had ever been in a fight. He walked over to Davis "[j]ust to make peace" and "[t]o let Anthony know it wasn't what he probably *** thought it was." Defendant went to the passenger side and saw Anthony in the driver's seat, but he did not notice anyone in the backseat. Anthony and Davis spoke for 10 or 15 minutes. Defendant told Anthony that

defendant's relationship with Davis was not "that serious," and Anthony told defendant, "[S]he could have told me who you [were]." Defendant reached over Davis and shook Anthony's hand "like it's all good."

¶ 26    Defendant thought that he had defused the situation "a bit," but then an Expedition drove close enough for the side mirror to "pretty much hit [defendant]." Defendant stood and asked if the man in the truck knew defendant. The man responded, "[N]o, I don't know you. That's my n*** down there. So, okay, we ain't on that." Defendant continued talking to Davis and Anthony. Then Lytony, who was sitting in the back seat and acting "belligerent," told defendant to "get the f*** away from the car." Anthony told Lytony to "be cool." Lytony stuck a finger out the window as if he were trying to take the cigarette that was in defendant's mouth, which defendant took as an aggressive move. Defendant said to Anthony, "[O]kay man I'll talk to you all later." Then, Lytony "reached for" a firearm on his lap with his right arm. There was "[n]o question in [defendant's] mind it was a gun," and defendant repeatedly told Lytony to "stop reaching." Lytony pulled the firearm out, and defendant "shot and kept moving."

¶ 27    Defendant denied that he stuck his hand in the vehicle or placed the firearm against Lytony's chest when he fired. He "knew" the people in the Pontiac were armed and thought "perhaps the truck was armed." Defendant denied that he continued to shoot at the two vehicles once they drove away. Rather, the Expedition began to back up, so defendant ran away and fired "a few warning shots" because he thought the truck was "coming." Defendant shot at the vehicles because he "didn't want them to make it to me" and did not "know what they had." Defendant "tossed" his firearm "not too far from the corner," hopped in "somebody['s]" vehicle, and went home.

¶ 28    Defendant explained that in the recorded interview at the police station that was presented to the jury, he denied knowing who shot Lytony because he did not "want to twist [his] words up" and "wanted to talk to [his] lawyer first." Defendant confirmed that he had received firearm-related convictions in 2002 and 2005.

¶ 29    On cross-examination, defendant stated that the club was not always dangerous, but the surrounding area was "not safe" because "[a]t any given time somebody might ride past and see somebody they don't like." Defendant passed through the club's security with the firearm in his right jacket pocket because he was a "regular." When defendant saw Lytony in the Pontiac, Lytony pulled the firearm "[o]ut [of] his pocket, maybe off his lap," and "raise[d]" it. Lytony's firearm was chrome and semi-automatic. Lytony was unable to point the firearm at defendant because as Lytony made "the gesture," defendant "shot in Lytony's direction" and "kept going." When the Pontiac and Expedition drove away, defendant fired but did not "intend*** to shoot anybody" and just "wanted them to hear." Defendant stopped shooting once the Expedition "pulled off." Afterwards, defendant flagged down a friend to drive him home, but tossed his firearm because he did not think she would have stopped if she saw his weapon. Defendant did not know where his firearm landed.

¶ 30    Defendant claimed he did not know Lytony was shot until police officers called him a few days after the incident. The police told defendant they wanted to speak with him, and defendant agreed to do so. Defendant stayed home, but the police never went to his house. He eventually went on vacation to Miami, and later, St. Paul, where he was arrested on a warrant.

¶ 31    The jury was instructed as to self-defense and the lesser-included offense of second degree murder. The jury found defendant guilty of one count of second degree murder as to Lytony; three

counts of attempt first degree murder as to Anthony, Davis, and Jenkins; and four counts of aggravated discharge of a firearm as to Anthony, Davis, Jenkins, and an occupied vehicle. The circuit court denied defendant's posttrial motion.

¶ 32    At the sentencing hearing, the circuit court merged the three aggravated discharge of a firearm counts that related to Anthony, Davis, and Jenkins into the corresponding attempt first degree murder counts involving those victims. The court imposed a total prison sentence of 45 years, comprising 15 years for second degree murder; 30 years each for the three attempt first degree murder convictions, which were to run concurrently with one another but consecutively with the second degree murder sentence; and 14 years for the remaining count of aggravated discharge of a firearm at an occupied vehicle, which was to run concurrent with the other sentences. The three attempt first degree murder sentences each consisted of 10 years for the underlying offense and a 20-year enhancement for the personal discharge of a firearm. The court denied defendant's motion to reconsider the sentence.

¶ 33    Defendant filed a direct appeal, arguing, *inter alia*, that the State failed to prove him guilty of attempt first degree murder where "the evidence against him at most prove[d] he had an unreasonable belief in the need to use deadly force in self-defense." *Jackson*, 2017 IL App (1st) 142841-U, ¶ 22. This court affirmed, noting, in relevant part, that the offense of attempt second degree murder "does not exist" in Illinois, and "defendant's claim that he at least had an imperfect claim of self-defense fails to negate or even mitigate" the offense of attempt first degree murder. *Id.* ¶ 29.

¶ 34    On December 28, 2018, counsel for defendant filed a postconviction petition, which alleged that defendant was actually innocent in light of an affidavit by Davis, which stated that

Lytony possessed a firearm on the night of the offense. The petition claimed that this affidavit constituted newly discovered evidence because Davis recanted her testimony at trial. According to the petition, the affidavit showed defendant acted in self-defense, therefore establishing that defendant did not have the requisite intent to support his convictions.

¶ 35    The petition included the affidavit of Davis, who averred that she, Anthony, and Lytony were "parked outside of the club when Anthony and [defendant] had a discussion through the car window." Davis alleged that "Lytony Dawson had a gun." Thus, Davis averred that "I believe [defendant] fired his gun in defense of his life based on what I witnessed that night." Davis claimed that when they arrived at the hospital with Lytony, "Anthony left with Lytony's gun to get rid of it." Davis knew this "because [Anthony] told [her] he was doing so when he left." Davis explained that at trial, she testified that no one in the Pontiac had a firearm because she "was very scared of the Dawson family." However, she "no longer associate[s] with anyone in the Dawson family" and no longer lives in Chicago, and therefore, "feel[s] safer coming forward with what I know about the night of the shooting."

¶ 36    On January 25, 2019, the circuit court summarily dismissed defendant's postconviction petition. The court reasoned that "even with the witness [having] recanted [her] testimony," the result at trial would not change. The court described Davis's affidavit as "light," as it only stated that a firearm was present but set forth no details as to whether the firearm was visible, displayed, or used, or whether Lytony threatened to use it. The court noted that many witnesses testified regarding the circumstances leading to the shooting, and Davis's affidavit was "different from what was testified to at Trial."

¶ 37 On appeal, defendant argues that the circuit court erred in summarily dismissing his postconviction petition where he set forth the gist of an actual innocence claim. Specifically, defendant asserts that Davis's new affidavit is material to whether defendant reasonably believed that his life was in danger when he acted in self-defense. The State responds that the theory of self-defense does not affect defendant's attempt first degree murder convictions, and that Davis's affidavit was insufficient for the petition to survive summary dismissal.

¶ 38 The Act provides a method for persons under criminal sentence to "assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both." *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). At the first stage of postconviction proceedings, "[t]he allegations of the petition, taken as true and liberally construed, need only present the gist of a constitutional claim." *People v. Brown*, 236 Ill. 2d 175, 184 (2010). This standard presents a low threshold, and "[a] petitioner need present only a limited amount of detail and is not required to include legal argument or citation to legal authority." *Id.* That said, the low threshold for surviving first-stage postconviction proceedings does not "excuse" a petitioner from "providing factual support for his claims," as the petitioner "must supply sufficient factual basis to show the allegations in the petition are capable of objective or independent corroboration." (Internal quotation marks omitted.) *People v. Allen*, 2015 IL 113135, ¶ 24.

¶ 39 The Act authorizes the circuit court to summarily dismiss the petition through a written order where "the court determines the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2010). A petition for postconviction relief is "frivolous or patently without merit" where it "has no arguable basis either in law or in fact." (Internal quotation marks omitted.)

*Hodges*, 234 Ill. 2d at 11-12. A petition lacks an arguable basis in law or fact where it "is based on an indisputably meritless legal theory or a fanciful factual allegation." *Id.* at 16. "An example of an indisputably meritless legal theory is one that is completely contradicted by the record," and "[f]anciful factual allegations include those that are fantastic or delusional." (Internal quotation marks omitted.) *People v. White*, 2014 IL App (1st) 130007, ¶ 18. We review *de novo* the summary dismissal of a postconviction petition. *People v. Tate*, 2012 IL 112214, ¶ 10.

¶ 40      The Illinois Supreme Court has set forth the principle that "no person convicted of a crime should be deprived of life or liberty given compelling evidence of actual innocence." *People v. Washington*, 171 Ill. 2d 475, 489 (1996). To establish actual innocence, a defendant must present supporting evidence that is (1) "newly discovered," (2) "material and not merely cumulative," and (3) "of such conclusive character that it would probably change the result on retrial." (Internal quotation marks omitted.) *People v. Edwards*, 2012 IL 111711, ¶ 32. Evidence is material where it is "relevant and probative of the petitioner's innocence," and it is noncumulative where it "adds to what the jury heard." *People v. Coleman*, 2013 IL 113307, ¶ 96. The conclusiveness of the new evidence is the "most important element" of an actual innocence claim. *People v. Robinson*, 2020 IL 123849, ¶ 47. While the new evidence "need not be entirely dispositive to be likely to alter the result on retrial," it must "place\*\*\* the trial evidence in a different light and undermine\*\*\* the court's confidence in the judgment of guilt." *Id.* ¶ 48. "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.*

¶ 41      Defendant asserts that Davis's affidavit establishes his actual innocence of second degree murder, attempt murder, and aggravated discharge of a firearm because it conclusively shows that

he acted in self-defense under the reasonable belief that his life was in danger. Section 7-1(a) of the Code (720 ILCS 5/7-1(a) (West 2010)) states:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."

¶ 42    To raise a claim of self-defense, the defendant must present evidence that (1) he was threatened with force; (2) he was not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he "actually believed that a danger existed, that the use of force was necessary to avert the danger, and that the kind and amount of force actually used was necessary"; and (6) his beliefs were reasonable. *People v. Morgan*, 187 Ill. 2d 500, 533 (1999). Self-defense is distinct from second degree murder "only in terms of the nature of defendant's belief at the time of the killing"; self-defense may apply where the defendant's belief as to the use of force was reasonable, while a conviction of second degree murder may be appropriate where the defendant's belief was unreasonable. *People v. Hooker*, 249 Ill. App. 3d 394, 403 (1993); see also 720 ILCS 5/9-2(a)(2) (West 2010). Because self-defense is "a justifying or exonerating circumstance," it may serve as the basis for an actual innocence claim. (Internal quotation marks omitted.) *People v. Woods*, 2020 IL App (1st) 163031, ¶ 41.

¶ 43    Initially, the State argues that evidence regarding defendant's use of self-defense does not impact his convictions for attempt first degree murder. The State reasons that Illinois law does not

allow a defendant to mitigate the offense of attempt first degree murder to attempt second degree murder based on an unreasonable belief in self-defense. Therefore, according to the State, defendant cannot be found guilty of attempt second degree murder as to Anthony, Davis, and Jenkins based upon the same unreasonable belief in the need for self-defense that supported defendant's second degree murder conviction as to Lytony.

¶ 44    It is undisputed that an offense of attempt second degree murder is a legal impossibility. See *People v. Lopez*, 166 Ill. 2d 441, 447-49 (1995) (stating that a defendant cannot attempt second degree murder because "one cannot intend to unlawfully kill while at the same time intending to justifiably use deadly force"); see also *People v. Guyton*, 2014 IL App (1st) 110450, ¶¶ 44-46. However, defendant does not assert that his attempt first degree murder convictions should be mitigated based on the same mental state underlying his second degree murder conviction. Rather, defendant claims that the new facts provided by Davis show that an exonerating circumstance existed, namely, that he justifiably acted in self-defense when he killed Lytony and shot at Anthony, Davis, and Jenkins. *Woods*, 2020 IL App (1st) 163031, ¶ 41. As such, defendant's actual innocence claim does not rely on the impossible mental state required by attempt second degree murder, but rather, implicates the perfect defense of self-defense.

¶ 45    That said, defendant's postconviction petition set forth conclusory allegations that were insufficient to show that he acted reasonably in self-defense and was therefore actually innocent of second degree murder, attempt first degree murder, and aggravated discharge of a firearm. The evidence at trial showed that defendant approached Anthony, Davis, and Lytony, who were seated in a Pontiac, to discuss an interaction that occurred earlier at a nearby club. Lytony repeatedly asked defendant for a cigarette, and there was conflicting testimony as to whether Lytony reached

for an object at this time. Then, Jenkins drove his Expedition behind defendant so that defendant was between the Pontiac and the Expedition. Defendant shot Lytony in the chest, causing Lytony's death. The Pontiac and Expedition drove away, and defendant repeatedly shot at both vehicles. Ten spent cartridges originating from the same firearm were found at the scene of the shooting, and bullet damage was observed in both the Pontiac and Expedition.

¶ 46    Davis's affidavit merely alleged that Lytony "had a gun" when the shooting occurred. There were no allegations that Lytony displayed the firearm, that he used or threatened to use it, or that defendant or any other witnesses saw the firearm.

¶ 47    As to defendant's second degree murder conviction, the mere allegation that Lytony "had a gun," with nothing more, fails to show that defendant was threatened with force or that he reasonably believed a danger existed and that shooting Lytony in the chest was necessary to avert that danger. *Morgan*, 187 Ill. 2d at 533. Davis's conclusory assertion that she "believe[d] [defendant] fired his gun in defense of his life based on what [she] witnessed that night" likewise did not set forth any factual basis that would have justified defendant in shooting Lytony. Even given the low threshold for surviving summary dismissal, defendant was not excused from setting forth a "sufficient factual basis" to show the allegations in his petition were "capable of objective or independent corroboration." (Internal quotation marks omitted.) *Allen*, 2015 IL 113135, ¶ 24. "[F]anciful factual allegation[s]" are not sufficient to survive the first stage of postconviction proceedings. *Hodges*, 234 Ill. 2d at 16.

¶ 48    We also note that defendant's petition and corresponding affidavit set forth no facts explaining how Lytony's possession of a firearm would have supported a self-defense theory as to his convictions for attempt first degree murder and aggravated discharge of a firearm. These

convictions were based on defendant's actions after shooting Lytony, specifically, shooting at Anthony, Davis, and Jenkins as they drove away from defendant. The mere fact that Lytony possessed a firearm would not have justified defendant in shooting at Anthony, Davis, and Jenkins as they fled. *People v. Guja*, 2016 IL App (1st) 140046, ¶ 54 ("[T]he right of self-defense does not permit one to pursue and inflict injury upon even an initial aggressor after the aggressor abandons the quarrel.").

¶ 49     Moreover, while the State's remaining witnesses, Anthony and Jenkins, stated that Lytony did not have a firearm on the night of the offense, defendant already submitted testimony at trial that Lytony had a firearm. Davis's assertion that Lytony had a firearm does not add any facts that the jury had not already heard and was therefore merely cumulative. *Coleman*, 2013 IL 113307, ¶ 96.

¶ 50     Ultimately, in convicting defendant of second degree murder, the jury agreed that defendant acted in self-defense in shooting Lytony, but found that the self-defense was not based on a reasonable belief that deadly force was necessary. 720 ILCS 5/9-2(a)(2) (West 2010). Defendant's mere assertion that Lytony possessed a firearm on the night of the offense, with no other facts, is not "of such conclusive character" that it would "probably change" this finding on retrial. *Edwards*, 2012 IL 111711, ¶ 32. Because defendant's actual innocence claim was only supported by conclusory, fanciful factual allegations, and because defendant failed to set forth noncumulative facts supporting his actual innocence claim, defendant failed to state the gist of a constitutional claim. As such, the summary dismissal of his petition was proper.

¶ 51     For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 52     Affirmed.