2024 IL App (1st) 220089-U

No. 1-22-0089

Order filed January 24, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 13972 |
| | ) | |
| COREY LARD, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Justices D.B. Walker and R. Van Tine concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The circuit court's summary dismissal of defendant's petition filed under the Post-
Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2020)) is affirmed where
defendant failed to present an arguable claim of actual innocence.

¶ 2     Defendant Corey Lard appeals from the summary dismissal of his postconviction petition filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). On appeal, he argues that the circuit court erred in dismissing his petition because he presented an

arguable claim of actual innocence based on the affidavits of two witnesses who did not testify at trial. We affirm.[1]

¶ 3    At a 2017 bench trial, defendant did not dispute that he shot and killed Henry Atkins but raised the affirmative defense of self-defense. Defendant was found guilty on 14 counts of first-degree murder while armed with a firearm for the shooting death of Atkins, as well as one count of aggravated battery of Luis Galvan, whom defendant had shot in the thumb. Defendant was found not guilty of attempted first-degree murder of Galvan.[2] The trial court imposed concurrent 45-year terms of imprisonment for three of the first-degree murder counts and merged the others, and imposed a consecutive 6-year term for the aggravated battery count.

¶ 4    On direct appeal, defendant argued, *inter alia*, that the convictions for first-degree murder should be reduced to second-degree murder based on his claim that he acted with an unreasonable belief in the need for self-defense. This court affirmed but ordered the mittimus corrected to reflect a single sentence of 45 years for first-degree murder and a 6-year consecutive sentence for aggravated battery. *People v. Lard*, 2020 IL App (1st) 172017-U, ¶¶ 1-2. Having set forth the facts in detail in our previous order (*id.* ¶¶ 1-32), we recount them here only to the extent necessary to resolve the issues raised in this appeal.

¶ 5    At the trial, Ericka Lacey testified that in April 2013 she was engaged to Atkins and living with him in an apartment at the 1400 block of East 52nd Street in Chicago. Lacey identified defendant in court and testified that Atkins knew him from around the neighborhood and that she

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2] Defendant, who was charged with 99 counts, went to trial on 60 counts of first-degree murder, one count of aggravated battery, three counts of attempted murder, six counts of home invasion, and four counts of residential burglary. *People v. Lard*, 2020 IL App (1st) 172017-U, ¶ 3.

never saw them engage in any dispute. Shortly after midnight on April 30, 2013, Atkins, who was unarmed and wearing jeans and a T-shirt, left to visit his friend, Luis Galvan, who lived in an apartment across the street. When shown the T-shirt that Atkins was wearing, the State's attorney noted that it had "some rips and some damage," and Lacey testified that it was not in that condition when Atkins left their apartment. Soon after he left, Lacey learned from police that he had been killed.

¶ 6    On cross-examination, Lacey denied that Atkins had been a cocaine dealer.

¶ 7    Galvan testified that, at the time of the shooting, he and his girlfriend, Catherine Figueroa, lived in an apartment at 52nd Street and Harper Avenue, and that he and Atkins had met and become friends earlier that year. At about midnight on April 30, 2013, Galvan invited Atkins to his apartment to smoke marijuana. Galvan was wearing white basketball shorts and no shirt. He did not have a firearm on his person or anything in his pockets, and there were no weapons in the apartment. After buzzing Atkins in, Galvan saw him in front of the apartment door. Atkins did not have anything in his hands or a firearm on his person.

¶ 8    Galvan then saw defendant, whom he did not know, round the corner from the direction of the apartment building's front stairway. Defendant grabbed the back of the collar of Atkins's shirt and tried to pull him out of the doorway of Galvan's apartment. Atkins grabbed the door frame, and Galvan grabbed Atkins under his armpits with both hands in an attempt to pull him into the apartment. While facing Atkins, Galvan saw defendant "reach over" with his right hand and fire a handgun once while pointing the firearm at both Atkins and Galvan. Before defendant fired, Atkins had not made any movements toward defendant, and neither he nor Galvan had yelled at or

threatened defendant. Galvan was shot in his left thumb, and he and Atkins fell to the floor of the living room. Galvan identified defendant in court.

¶ 9    The State introduced an audio recording of a 911 call by Galvan that was admitted into evidence and published. Galvan testified he told the operator the shooter was "from next door" because Galvan had seen him "hanging around with the other guys once or twice" at the building where Atkins lived.

¶ 10    On cross-examination, Galvan denied that he was a drug dealer or that he ever sold marijuana to defendant.

¶ 11    Figueroa testified that she and Galvan lived in a third-floor studio apartment. On the night of the shooting, Figueroa had been sleeping before Galvan told her Atkins was coming over. Three minutes later, Figueroa, from a distance of seven or eight steps and with an unobstructed view, saw Atkins standing in the doorway and speaking with Galvan. A "surprised reaction" came over Atkins's face as he put his hands on the door frame and tried to push himself into the apartment. Figueroa could not see anyone behind Atkins. She saw Atkins push himself forward and be pulled back three times. She did not see Atkins move toward anyone in the hallway and did not see anything in his hands, which were on the door frame. She did not hear Atkins or Galvan threaten or yell at anyone.

¶ 12    Galvan was shirtless and wearing basketball shorts; his pockets were "short" and empty, and could have "barely fit a cell phone." Galvan did not have a firearm in his hand and was not near a gun, and there was no firearm in the apartment. Galvan wrapped his hands around Atkins's waist and pulled him into the apartment, and then the two men stumbled toward a wall behind Galvan. She saw a hand holding a firearm reach through the left side of the front door and then

heard a shot from the front door and saw a light come out of the firearm. Galvan and Atkins took a few steps and fell to the living room floor. Galvan then rose, closed and locked the front door, and called 911.

¶ 13    Figueroa identified photographs of the apartment that were entered into evidence. Figueroa identified from a photograph the wall that Galvan and Atkins had "held up against," which was located near the front door. She identified Atkins as the person lying on the living room floor in another photograph and testified that it showed him in the location where he had fallen. Figueroa further testified that an indentation visible on the wall in another photograph had not been present before the incident.

¶ 14    On cross-examination, Figueroa testified that Galvan had not been a drug dealer at the time of the shooting.

¶ 15    Officer Anthony Jones testified he and his partner arrived at the apartment fewer than five minutes after receiving the call of a person shot. Jones identified the exterior and interior of Galvan and Figueroa's apartment building in photographs, which were admitted into evidence. These photographs depict a blue cap covering a shell casing just inside the living room, next to the front entrance hallway.

¶ 16    Detective Anthony Burns testified he was assigned to investigate Atkins's death. No firearms were recovered from the apartment. From photographs admitted into evidence, Burns identified a bullet fragment on the floor behind the bed and a wall marking from a bullet.

¶ 17    Officer Thomas Gorman identified defendant in court and testified that he was arrested on June 4, 2013.

¶ 18 Doctor Grace Dukes of the Cook County Medical Examiner's Office was qualified by the court as an expert in forensic pathology. Prior to her testimony, she had reviewed the reports of Dr. Steven Cina, who had performed Atkins's autopsy. When the Medical Examiner's office received Atkins's body, there were "defects" in his shirt. "[T]raumatic defects" were observed in his lungs, heart, and chest wall. An entrance gunshot wound was identified on the right side of his chest and an exit wound on the left side. The State introduced a stipulation that evidence technician Elizabeth Dawson took custody of a black T-shirt from the Medical Examiner's office.

¶ 19 Defendant testified that a week before the shooting, on April 23, 2013, he smoked marijuana in the lobby of a building on the 1400 block of East 52nd Street. Atkins entered the lobby, told defendant he "was making it hot where [Atkins] sold drugs" and that defendant needed to leave before Atkins returned, and walked away.

¶ 20 Defendant further testified that on April 30, 2013, he went to Galvan's apartment and knocked on the door. Galvan was "a known drug dealer in that area" from whom defendant had previously purchased marijuana. Galvan answered the apartment door, collected $40 from defendant, told him to wait in the hallway while he "put that purchase together," and closed the door. Minutes later, Atkins walked up behind defendant, grabbed his jacket, and asked why he was in that building. Defendant grabbed for Atkins's arm, pulled away, and told him to let go. Atkins "started throwing blows," hitting defendant in the face. Defendant tried to "block [him]self."

¶ 21 Galvan opened the apartment door, stepped into the hallway, and asked what was going on. Atkins told Galvan to grab defendant, and Galvan "grabbed for [defendant] and started to pull [him] in the hall." Atkins and Galvan then "started pulling [defendant] in." Defendant "started using the wall as leverage, trying to back pedal, grabbing for [Atkins]'s arm trying to pull away,

trying to separate [him]self from the both of them." Galvan released defendant, stepped back, and raised his shirt, revealing a firearm. Defendant "tried to back pedal and dug down and went for the firearm" in his pocket. When defendant drew his firearm, Atkins released him and tried to move out of the way, but Galvan pulled Atkins in front of himself, "basically as a shield." Defendant fired toward Galvan "because [he] thought [Galvan] was going for a weapon," and then turned and ran.

¶ 22 On cross-examination, defendant testified Atkins struck him three or four times in the hallway before Galvan opened the door. Defendant's "lip was busted" and bleeding. Galvan was wearing a white T-shirt, which he lifted with his right hand "like he was going for a firearm." Defendant did not recall what bottom garment Galvan was wearing, but it may have been light gray. Galvan had a firearm in his right waistband. Galvan "didn't get a chance to grab for his gun," but defendant thought he was going to grab it. Seeing Galvan's hand "by his gun," defendant drew his own firearm from his left pocket. Galvan put his arm around Atkins's neck, pulled Atkins in front of him, and used him as a shield. Defendant "shot before [Galvan] had a chance to pull out his gun and shoot." Defendant fired "in the direction of" Galvan and "didn't mean to hit" Atkins. Defendant is left-handed and fired using his left hand. Defendant did not rip Atkins's shirt or grab his clothing. Presented with the victim's T-shirt, defendant acknowledged a "big rip on the neck" and testified that Galvan "probably ripped [Atkins's] shirt when he was grabbing him as a shield," but denied seeing how the rip occurred.

¶ 23 In announcing its finding of guilty, the court stated that the physical evidence did not corroborate defendant's testimony, but did corroborate Galvan's testimony that Atkins was facing him and that defendant was behind Atkins. The court noted that Atkins's T-shirt was "ripped from

the back and around the neck," and that had the confrontation been face-to-face "[one] would expect that there might be a rip" in the front, not the back. The court concluded that the shooting happened as Galvan and Figueroa testified and found both eyewitnesses to be credible. The court further found that defendant's claim that Galvan had a firearm in his waistband was a "total lie" because "[one] could not hold a weapon in a pair of pants like that." As such, the court concluded that the physical evidence did "not corroborate *** that this is a self-defense shootout between [Galvan] and *** defendant."

¶ 24    Defendant filed a motion for a new trial, which the trial court denied, rejecting his self-defense theory and the lesser included offense of second-degree murder. The court sentenced him to 51 years' imprisonment and denied his subsequent motion to reconsider sentence.

¶ 25    On direct appeal, defendant argued that the evidence showed he had acted with an unreasonable belief in the need for self-defense and that his convictions should be reduced to second-degree murder. This court affirmed, noting that Atkins was unarmed and did not present a threat to defendant, and that defendant did not testify that he had felt threatened by Atkins. *Lard*, 2020 IL App (1st) 172017-U, ¶¶ 42-43. "More importantly," we deferred to the trial court's determinations that Figueroa and Galvan were credible and that defendant's account that Galvan reached for a gun in his waistband was a " 'total lie,' " and also concluded that a rational trier of fact could have found that Dukes's testimony on the autopsy findings, combined with the physical evidence, did not support the conclusion that defendant had acted in self-defense. *Id.* ¶ 46.

¶ 26    On August 20, 2021, defendant, represented by counsel, filed his petition under the Act, asserting a claim of actual innocence and attaching the notarized affidavits of Devonta Carr and Orlando Loften.

¶ 27　Carr, in his affidavit, avers that on April 30, 2013, he went to Galvan's apartment to purchase Ecstasy pills. As he turned the corner from the stairwell looking towards Galvan's apartment, he noticed "this guy in black grab" defendant and say, " 'N*** didn't I tell you don't come over here anymore.' " Carr turned around and went home because he "didn't want the guy in black to do anything to [him]." Upon learning "soon after" that defendant "killed that guy," Carr "instantly said" defendant had acted in self-defense. Carr told defendant's cousin, who told Carr to "help" defendant, but Carr told the cousin he did not want to get involved, and never reached out to defendant. "Feeling bad now," Carr is willing to testify, even though he did not want to do so at the time of trial.

¶ 28　Loften avers in his affidavit that on April 30, 2013, he went to Galvan's apartment "to buy weed" from Galvan. Through Galvan's wide open apartment door, Loften saw Galvan kneeling on the floor over someone who was lying on the floor. Galvan was yelling, " 'I just know he shot him.' " Upon seeing Loften, Galvan said, " 'Police coming.' " Galvan "picked up a silver revolver that was right beside him" and "went under a futon and grabbed some weed that some female was laying [*sic*] on." Galvan gave both items to Loften and told him to " 'get rid of it.' " Loften immediately left the building before police arrived. A few days later, Galvan told Loften " ' they was trying to rob [defendant] but [defendant] had a gun also' " and warned Loften that he " 'better not say nothing or [he would] be charged with a gun case.' " Loften further avers that he "recently saw" defendant and that defendant told him to contact his lawyer. Loften is willing to testify if called as a witness.

¶ 29　On September 17, 2021, the circuit court entered a written order summarily dismissing the petition. The court found the evidence in the affidavits was not sufficiently "conclusive" to raise a

colorable claim of actual innocence, as neither affiant averred he had witnessed the shooting, explained why Atkins's shirt was ripped in the back, or supplied the critical facts necessary to establish defendant's claim of self-defense or unreasonable self-defense.

¶ 30    On appeal, defendant argues that the court erred in summarily dismissing his petition because the proposed testimony of Loften and Carr adequately support a claim of actual innocence. Therefore, he requests that we remand the case for second-stage proceedings.

¶ 31    The Act provides a method for a defendant to collaterally attack a conviction by asserting that it resulted from a substantial denial of his constitutional rights. 725 ILCS 5/122-1 *et seq.* (West 2020); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). Generally, at the first stage, a trial court may summarily dismiss a postconviction petition within 90 days upon determining that it "is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2020). A petition is frivolous or patently without merit only when it "has no arguable basis in either fact or law." *Hodges*, 234 Ill. 2d at 11-12.

¶ 32    A petition has no arguable basis in fact or law where it is "based on an indisputably meritless legal theory or a fanciful factual allegation" (*id.* at 16) or where the asserted claim has been forfeited or is barred by *res judicata* (*People v. Blair*, 215 Ill. 2d 427, 445 (2005)). Summary dismissal is also appropriate if the petition neither includes the necessary affidavits, records, or other evidence supporting the allegations therein nor explains why the same are not attached (725 ILCS 5/122-2 (West 2020); *People v. Collins*, 202 Ill. 2d 59, 66 (2002)), or alleges only nonfactual and nonspecific assertions amounting to mere conclusions (*People v. Morris*, 236 Ill. 2d 345, 354 (2010)). The summary dismissal of a petition under the Act is reviewed *de novo*. *People v. Allen*, 2015 IL 113135, ¶ 19.

¶ 33    A freestanding claim of actual innocence based on newly discovered evidence is cognizable under the Act as a matter of due process. *People v. Washington*, 171 Ill. 2d 475, 489 (1996); Ill. Const. 1970, art. I, § 2. "Substantively, in order to succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial." *People v. Coleman*, 2013 IL 113307, ¶ 96 (citing *Washington*, 171 Ill. 2d at 489). To survive summary dismissal at the first stage of postconviction proceedings under the Act, a petition claiming actual innocence based on newly discovered evidence must present evidence that is "arguably" new, material, noncumulative, and so conclusive that it would probably alter the result on retrial. *People v. White*, 2014 IL App (1st) 130007, ¶ 18 (citing *Coleman*, 2013 IL 113307, ¶ 96; *People v. Thomas*, 2014 IL App (2d) 121001, ¶ 47).

¶ 34    "[T]he conclusiveness of new evidence is the most important element of an actual innocence claim." *People v. Sanders*, 2016 IL 118123, ¶ 47 (citing *Washington*, 171 Ill. 2d at 489). Where a defendant fails to demonstrate that the evidence is arguably conclusive, the reviewing court need not address whether the other criteria of an actual innocence claim are met in order to affirm a summary dismissal of a petition based on a claim of actual innocence. See *People v. Mabrey*, 2016 IL App (1st) 141359, ¶ 25 (affirming summary dismissal; "Assuming without deciding that [the proposed] affidavit may be considered arguably new and noncumulative, we conclude that it is not arguable that the evidence contained in the affidavit is of such a conclusive character that it would probably change the result on retrial.").

¶ 35    To be deemed conclusive, the new evidence "need not be entirely dispositive," as "[p]robability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *People v.*

*Robinson*, 2020 IL 123849, ¶ 48. Stated differently, new evidence is sufficiently conclusive if it "places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 56 (reversing denial of the defendant's motion for leave to file a successive petition under the Act where the evidence was sufficiently "conclusive" and the trial evidence included neither an eyewitness identification nor physical evidence implicating the defendant). Where the new evidence presented in support of a petition at the first stage of proceedings under the Act consists of affidavits, we must accept their assertions as true unless they are affirmatively rebutted by the record. *Mabrey*, 2016 IL App (1st) 141359, ¶ 19.

¶ 36   Having carefully reviewed the record, we find that summary dismissal of defendant's petition was proper because the proposed evidence of actual innocence of the two witnesses is not arguably so conclusive that it would probably alter the result on retrial.

¶ 37   In this court, defendant argues that the two affidavits "support [his] claim of self-defense and unreasonable belief in self-defense," and, therefore, of actual innocence. As noted, Carr's affidavit states that he observed in the hallway of Galvan's apartment building a "guy in black grab [defendant]" and say " 'N*** didn't I tell you don't come over here anymore.' " Loften's affidavit states that he saw a "body" on the floor of Galvan's apartment, that Galvan gave Loften "some weed" and "a silver revolver that was right beside him," and that Galvan told Loften to " 'get rid of it.' "

¶ 38   To raise a claim of self-defense, a defendant must present evidence that (1) force was threatened against him; (2) he was not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he "actually believed that a danger existed, that the use of force was necessary to avert the danger, and that the kind and amount of force actually used was

necessary"; and (6) his beliefs were reasonable. *People v. Morgan*, 187 Ill. 2d 500, 533 (1999). In contrast, a conviction of second-degree murder may be appropriate if the first five elements are met, but, as to the sixth element, the defendant's belief in the need for self-defense was "unreasonable." *People v. Hooker*, 249 Ill. App. 3d 394, 403 (1993); see also 720 ILCS 5/9-2(a)(2) (West 2012) (second-degree murder where, "at the time of the killing [the defendant] believes the circumstances to be such that, if they existed, would justify or exonerate the killing \*\*\*, but his or her belief is unreasonable"). Thus, self-defense and unreasonable self-defense differ "only in terms of the nature of defendant's belief at the time of the killing." *Hooker*, 249 Ill. App. 3d at 403.

¶ 39    We briefly note that although self-defense is a justifying or exonerating circumstance and a valid basis for a claim of actual innocence of first-degree murder (*People v. Horton*, 2021 IL App (1st) 180551, ¶ 46 (citing *People v. Woods*, 2020 IL App (1st) 163031, ¶ 41)), defendant cites no authority to support his assumption that the same can be said of *unreasonable* self-defense, *i.e.*, second-degree murder. However, regardless of whether a finding of second-degree murder or unreasonable self-defense can support a claim of actual innocence of first-degree murder, we do not find the proposed evidence sufficiently conclusive for the petition to survive summary dismissal. Stated differently, we cannot say it is even arguable that the proposed testimony set forth in the affidavits of Carr and Loften, taken as true, is so conclusive it would probably change the result on retrial or undermines confidence in the judgment as to defendant's guilt.

¶ 40    Carr avers he rounded a corner in Galvan's apartment building and observed, from a distance, a man in the hallway dressed "in black"—presumably Atkins, whose T-shirt was black— "grab" defendant and say, " 'N\*\*\* didn't I tell you don't come over here anymore.' " Carr does not claim to have seen Galvan, a handgun, or the apartment's interior, nor to have witnessed any

other portion of any altercation. Although defendant argues that Carr's affidavit supports the conclusion that defendant was not the aggressor—an essential element of self-defense (*Morgan*, 187 Ill. 2d at 533)—we disagree. Carr cannot testify as to what transpired before he rounded the corner and saw Atkins "grab" defendant. It is undisputed that Atkins was unarmed. "While the law does not require the aggressor to be armed for self-defense to be justified, it must appear that the aggressor is capable of inflicting serious bodily harm without the use of a deadly weapon, and is intending to do so." *People v. Hawkins*, 296 Ill. App. 3d 830, 837 (1998) (citations omitted). Carr's proposed testimony does not even arguably suggest that Atkins demonstrated such capacity or intent.

¶ 41    Nor can Carr's averments, taken as true, establish any other elements of reasonable or unreasonable self-defense. Indeed, his description of Atkins's conduct in the hallway appears to be of very limited relevance given the evidence, including defendant's testimony, that the shooting occurred inside the apartment after Atkins had entered it, that defendant intended to shoot *Galvan* upon seeing *Galvan* reach for a handgun in his waistband, and that defendant shot Atkins inadvertently while Galvan used him as a "shield."

¶ 42    Defendant does not retract his trial testimony; on the contrary, his petition alleges that the new evidence "illustrates that [his] version of events was accurate." Thus, whether he acted in self-defense or unreasonable self-defense depends on Galvan's actions in the apartment, which Carr, who immediately fled, did not witness. Nor would a finding that Atkins was the initial aggressor in the described altercation in the hallway indicate that defendant was not the initial aggressor in the subsequent shooting inside the apartment. See *People v. De Oca*, 238 Ill. App. 3d 362, 368 (1992) (right of self-defense did not justify the defendant's shooting of the initial aggressor in a

fistfight where evidence showed that after the fistfight had ended "the situation transformed into a different encounter when defendant displayed a loaded shotgun and shouted at the crowd which had gathered at the corner").

¶ 43    Loften's affidavit likewise fails to support defendant's claim. Loften's affidavit is relevant only in suggesting that, after defendant fled Galvan's apartment but before the police arrived, a handgun was on the floor, along with drugs, near Galvan, and that Loften removed the handgun from the apartment. Such testimony, taken as true, supports an inference that the handgun was in the apartment at the time of the shooting, and explains why the police did not recover a handgun from the apartment. However, Loften's proposed testimony would not place a handgun in Galvan's waistband, on Galvan's person, or even within his immediate reach when defendant shot Atkins, and thus does not corroborate defendant's claim of actual innocence. See *People v. Jackson*, 2021 IL App (1st) 190406-U, ¶¶ 46-47, 50 (affirming summary dismissal of initial postconviction petition; witness's mere averment that the victim " 'had a gun' " failed to show the defendant was threatened with force or that he reasonably believed a danger existed, and thus was not arguably of such conclusive character that it would likely change the result on retrial) (citing *People v. Edwards*, 2012 IL 111711, ¶ 32).[3]

¶ 44    In sum, we find the proposed testimony of Carr and Loften, neither of whom witnessed the shooting, irrelevant to the elements of self-defense or unreasonable self-defense. Accordingly, we cannot say that their affidavits, collectively or individually, are even arguably so conclusive as to render it likely that their testimony would change the result on retrial.

---

[3] Citing as persuasive authority pursuant to Illinois Supreme Court Rule 23(e)(1) (eff. Feb. 1, 2023) ("a nonprecedential order entered under subpart (b) of this rule on or after January 1, 2021, may be cited for persuasive purposes").

¶ 45    In finding the affidavits inadequate to support a claim of actual innocence at the first stage of postconviction proceedings, we find persuasive *People v. Garcia*, 2022 IL App (1st) 210040. In support of his actual innocence claim, the defendant, who was convicted of first-degree murder and robbery in the beating death of the victim, provided the affidavit of a witness who averred that on the date of the crime she saw the defendant " 'trying to stop a fight between two men who were punching, kicking, stomping, and throwing bottles at a man who fell to the ground' " and standing in front of them to " 'prevent further blows against the man who was still on the ground.' " *Id.* ¶¶ 1, 14. The witness further averred that a State's witness who had, at trial, identified the defendant as one of two men who had beaten the victim had only implicated the defendant out of spite. *Id.* ¶ 14.

¶ 46    We affirmed the summary dismissal order of the circuit court because the affidavit made clear that the witness did not see "the beginning of the altercation" and because the affidavit failed to "describe what she saw at the end of the altercation." *Id.* ¶ 36. Nor did the affidavit contradict the trial testimony of the State's witnesses that they saw defendant attack the victim, jump on his chest, and take his wallet. *Id.* The new evidence also did not contradict either the physical evidence of the victim's injuries, which corroborated the State's witnesses' testimony, or the forensic findings of the victim's blood on the defendant's shoe and defendant's shoe impressions on the victim's shirt. *Id.*

¶ 47    Similarly, here, we find that testimony as to the limited facts presented in the affidavits would not contradict the evidence presented at trial. Neither could the proposed testimony establish any of the essential elements of self-defense or unreasonable self-defense, *i.e.*, that defendant was threatened with force, that he was not the aggressor in the shooting, that the danger of harm was

imminent, that the threatened force was unlawful, and that he reasonably believed a danger existed and that the shooting was necessary in order to avert that danger. See *Morgan*, 187 Ill. 2d at 533. Therefore, the evidence does not support a finding that, arguably, the proposed testimony of Carr and Loften, taken as true, likely would change the result on retrial. See *Coleman*, 2013 IL 113307, ¶ 96. Because the evidence supporting the actual innocence claim is not arguably conclusive, we conclude that the circuit court did not err in summarily dismissing defendant's petition.

¶ 48   For the foregoing reasons, we affirm the order of the Circuit Court of Cook County.

¶ 49   Affirmed.